JOURNAL ENTRY and OPINION.
{¶ 1} Defendants-appellants Everen Securities and First Union Securities, appeal the jury verdict in the amount of $2.2 million awarded to plaintiff-appellee, Reginald Rucker. We find merit to the appeal and reverse the trial court's denial of Everen's motion for judgment notwithstanding the verdict.
 {¶ 2} On December 1, 2000, Rucker filed a complaint against Everen Securities, Inc., First Union Securities, Inc., and Brand Meyer.[1] He alleged causes of action for race discrimination, constructive discharge, and wrongful discharge in violation of public policy. He later amended his complaint to add a claim for promissory estoppel.
 {¶ 3} After the court denied Everen's motion for summary judgment, the matter proceeded to a jury trial where the following evidence was presented.
 {¶ 4} In 1992, Rucker was hired as a securities broker at Dean Witter. In 1995, Rucker's former boss at Dean Witter, Larry Bain, left Dean Witter to become the Woodmere Branch manager for Everen Securities. Bain began recruiting brokers from Dean Witter for Everen. Rucker was one of the brokers whom Bain pursued. In an attempt to persuade Rucker to leave Dean Witter, Bain persuaded Rucker to speak with Brand Meyer, the regional director at Everen in Chicago. Meyer extended an offer of employment to Rucker, which Rucker initially rejected because the offer did not include a "forgivable loan," which is customarily given when recruiting brokers.
 {¶ 5} After Rucker refused the initial offer, Bain contacted him to determine what it would take to persuade him to leave Dean Witter. Rucker informed Bain that along with being a broker, he wanted to create a minority investment firm and that he wanted $10,000 to join the Shoreby Club to obtain business contacts. Rucker testified that he had owned a prior minority business enterprise by the name of Rucker's Communications.
 {¶ 6} Rucker had already received $20 million in endowment funds from the Cleveland Museum of Art to manage, through contacts he had obtained with the help of George Humphrey, who at the time was the Chairman of the Endowment Committee at University Hospitals. Rucker explained to Bain that although he had the contacts to create the investment firm, he did not have the expertise or equipment. After speaking with Brand Meyer, Bain informed Rucker that he could "guarantee" that Everen would make Rucker's minority investment firm a reality and also personally loaned Rucker $10,000 to join the Shoreby Club.
 {¶ 7} Based on ensuing representations and promises, Rucker accepted the position with Everen and began working as a broker for the firm in August 1995 at the Woodmere office. In addition, he began educating Bain regarding what was required for establishing and maintaining a minority business enterprise.
 {¶ 8} In September 1995, Rucker and Bain went to Chicago to meet with Everen senior managers Tom Reedy and Felicia Flowers-Smith to submit a proposal for establishing the minority investment enterprise. After the meeting, Rucker felt that senior management was excited and would support the venture. Bain sent Reedy a memo outlining the matters discussed, including creating a separate space for Rucker's minority business, which he stated should be a joint venture. Rucker was not sent a copy of this memorandum.
 {¶ 9} In anticipation of establishing the new enterprise, Rucker obtained his Series 65 broker's license so that he could become a registered investment adviser. He also opened bank accounts and created marketing materials for the minority firm, for which he chose the name Rucker Investment Consultants ("RIC").
 {¶ 10} In April 1996, Everen presented an agreement to Rucker regarding the enterprise, which specified that Rucker would receive 50 percent of the fees and commissions for the first six months and 40 percent thereafter. It also set forth that RIC was to be an independent contractor and not a joint venture. Although Rucker testified that he was troubled by the compensation schedule and the fact that RIC was to be an independent contractor, with no mention of separate office space, he signed the contract, which contained an integration clause stating that the written contract represented the entire agreement between the parties. Rucker believed that the way RIC was structured would prevent him from receiving public set-aside funds for minorities.
 {¶ 11} Flowers-Smith, who was present at the September 1995 meeting and had experience with minority business enterprises, testified that the agreement was nothing more than a compensation agreement, was not consistent with what was represented to Rucker at the meeting, and that the new agreement appeared to be a "front" for Everen to obtain public set-aside funds for minority companies.
 {¶ 12} Although Everen did not provide RIC a space apart from its facilities, a sign for Rucker Investments was placed on the front door below Everen's name and was also placed on the back entrance. Rucker was also permitted to use the staff and support he used as a broker at Everen to support RIC. He was also named president of RIC, RIC was registered with the State as a minority business enterprise, and a U-4 form was filed. Everen also paid Rucker's legal expenses in developing RIC and paid for his marketing brochures. Rucker was 100 percent owner of RIC and in fact, attempted to sell 49 percent of the company to Everen in 1999 for $75,000 in order to dissolve loans that Everen had given him.
 {¶ 13} Rucker testified that in 1998, in an attempt to obtain funds for RIC, he met with George Forbes, who served on the commission overseeing the $1.4 billion in minority set-aside funds with the Ohio Worker's Compensation Bureau. Because there were few minority money managers in Ohio, Rucker felt he had a good chance to receive the bid to manage the funds. Rucker, however, did not receive the bid. During the discovery process for trial, he learned that Everen never sent the bid in for him and that he was also two months late in submitting his part of the bid. In spite of this evidence, Rucker speculated that he did not receive the bid because RIC was not properly structured.
 {¶ 14} Marc Silberger succeeded Bain as the branch manager for Everen Securities in the Woodmere office from March to November 1999. He testified that Rucker approached him regarding the Ohio Worker's Compensation bid in May or June 1999, and he recalled that it was "late in the game" for the bid. In fact, the document referring to the process for the bid indicated the final date to submit the bid was March 25, 1999.
 {¶ 15} Lawrence Bain testified that Rucker attempted to establish a minority investment firm at Dean Witter, but that Dean Witter had no interest in establishing such a firm. He also testified that Rucker received a separate paycheck for his compensation for RIC. Bain also stated that Rucker was aware that Everen would not be able to provide him separate space for RIC, but that Rucker was "okay" with it.
 {¶ 16} Rucker resigned from Everen on November 19, 1999 because of alleged discriminatory conduct by Everen and his unhappiness with how RIC was structured. At the time he left, RIC was an ongoing business with $52 million in managed funds.
 {¶ 17} Before the matter proceeded to the jury, Rucker voluntarily dismissed his wrongful discharge claim and the claim against Meyer. The matter proceeded to the jury on Rucker's promissory estoppel and race discrimination claims. The jury found in favor of Rucker on his promissory estoppel claim in the amount of $2.2 million and in favor of Everen on Rucker's discrimination claim.
 {¶ 18} Thereafter, Everen filed a motion for judgment notwithstanding the verdict ("JNOV"), or in the alternative a new trial. Rucker filed a motion for prejudgment interest pursuant to R.C. 1343.03(A). All of these post-trial motions were denied by the trial court.
 {¶ 19} Everen appeals, raising four assignments of error, and Rucker cross appeals, arguing one assignment of error.
 Denial of Motion for JNOV or New Trial {¶ 20} In its first two assignments of error, Everen appeals the trial court's denial of its motion for JNOV or new trial. Everen argues that the evidence did not support the trial court's verdict in Rucker's favor on his promissory estoppel claim because Rucker signed a written contract evidencing their agreement, which also contained an integration clause. Everen also argues that it fulfilled the promises it made to Rucker and that Rucker suffered no damages.
 {¶ 21} In considering a motion for judgment notwithstanding the verdict, a court does not weigh the evidence or test the credibility of the witnesses. Osler v. Lorain (1986), 28 Ohio St.3d 345, syllabus. The test to be applied in ruling on a motion for judgment notwithstanding the verdict is the same test for ruling on a motion for a directed verdict. Id. at 347. The evidence must be construed most strongly in favor of the party against whom the motion is made and where there is substantial evidence to support such party's side, upon which reasonable minds may reach different conclusions, the motion must be denied. Id.
 {¶ 22} Everen contends that in the alternative, the trial court should have granted its motion for a new trial. A new trial may be granted on all or part of the issues upon grounds that the judgment is contrary to law. Civ. R. 59(A). In its memorandum in support of its motion for a new trial, Everen argued that a new trial was warranted for essentially the same reasons set forth in its motion for judgment notwithstanding the verdict.
 {¶ 23} Promissory estoppel encompasses a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee, does induce such action or forbearance and is binding if injuries can be avoided only by enforcement of the promise.McCroskey v. State (1983), 8 Ohio St.3d 29, 30.
 {¶ 24} The elements of a claim for promissory estoppel are as follows: (1) a clear, unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and foreseeable; and (4) the person claiming reliance is injured as a result of reliance on the promise. Weiper v. W.A. Hill Assoc. (1995), 104 Ohio App.3d 250, 260.
 {¶ 25} We conclude, construing the evidence most strongly in favor of Rucker, that the evidence did not support his promissory estoppel claim.
 {¶ 26} Although Rucker testified at length regarding the promises that were made to him regarding the establishment of a minority business enterprise, the written agreement he subsequently entered into with Everen evidences none of these promises, and does not even refer to a minority business enterprise. This contract also contains an integration clause, which states:
 {¶ 27} "5.1. This agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings and representations, whether oral or written, of the parties in connection therewith except to the extent incorporated or specifically referred to herein. No covenant or condition or representation not expressed in this Agreement shall affect or be effective to interpret, change (sic) or prior drafts shall be admissible into evidence in any action or suit involving this Agreement."
 {¶ 28} In Busler v. D H Mfg., Inc. (1992), 81 Ohio App.3d 385,390, the court held:
 {¶ 29} "If contracting parties integrate their negotiations and promises into an unambiguous, final, written agreement, then evidence of prior or contemporaneous negotiations, understandings, promises, representations, or the like pertaining to the terms of the final agreement are generally excluded from consideration by the court. (Citations omitted.) This rule is not confined to excluding merely parol communications; it excludes contrary written communications as well."
 {¶ 30} Therefore, the written contract precludes any claim by Rucker of promissory estoppel because any oral promises made to Rucker prior to entering into the written agreement cannot be considered.
 {¶ 31} Although Rucker contends he objected to the contract, he nonetheless signed the contract without indicating anywhere on the document that his signature was subject to certain conditions. Rucker is an experienced businessman, sophisticated in minority business enterprises as a prior owner of a minority business. Therefore, if he was not happy with the terms of the contract, he should have continued negotiating the terms.
 {¶ 32} Although Rucker argues the written contract does not apply to him because he was signing the contract on behalf of Rucker Investment Consultants, he was a third-party beneficiary to the agreement. In Hillv. Sonitrol (1988), 36 Ohio St.3d 36, 40, the Ohio Supreme Court held: "If the promisee * * * intends that a third party should benefit from the contract, then that third party is an `intended beneficiary' who has enforceable rights under the contract." The contract in the instant case indicated that RIC was an independent contractor and that RIC would receive a certain percentage of the fees and commissions. It is undisputed that Rucker was the only one besides Everen to share in a distribution of the fees and commissions.
 {¶ 33} Third-party beneficiaries acquire no greater rights than that provided in the contract. Union S. L. Co. v. N.E. 728, 38 Ohio L. Rep. 480, paragraph one of the syllabus. Because the contract clearly intends to benefit Rucker, he was bound by its terms and acquired no greater rights outside of the contract.
 {¶ 34} Furthermore, even if the integration clause did not apply, there is no indication that the promises were not fulfilled or that Rucker suffered any damages. The evidence indicates that Rucker Investment Consultants was created and certified as a minority business enterprise. Tax records and Rucker's testimony indicate it was an ongoing business with $52 million in managed funds. Rucker also received a separate paycheck as compensation from RIC.
 {¶ 35} Although Rucker maintained at trial that he was unable to receive minority set-aside funds from public entities because of the way RIC was structured, there was no evidence presented that RIC was denied any funds based on its improper structure. Rucker only speculated he was denied the Ohio Worker's Compensation funds based on deficiencies in RIC's structure. He was not informed by the Bureau that this was the reason, and the evidence demonstrated that Rucker was two months late in submitting his bid.
 {¶ 36} Based on the above, the trial court erred in denying Everen's motion for JNOV.
 {¶ 37} Everen's first two assignments of error are sustained.
 {¶ 38} Because we find the trial court erred in failing to grant Everen's motion for JNOV, Everen's remaining assignments of error regarding irregularities at trial and request for remittitur are moot, as well as Rucker's cross-assignment of error regarding the trial court's denial of his motion for prejudgment interest.
JAMES J. SWEENEY, P.J. and DIANE KARPINSKI, J. CONCUR
[1] Rucker was initially hired by Kemper Securities. Shortly thereafter Kemper Securities was bought by Everen Securities, which was then subsequently bought by First Union Securities. For ease of discussion, the appellee will be referred to as Everen Securities, because Everen owned the company during most of the time Rucker was employed with the company.